**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| ROMAN LAVRENOV, on behalf of himself and all others similarly situated, | : <br> : <br> : | Case No.: |
| Plaintiff, | : <br> : | CLASS ACTION COMPLAINT |
| v. | : <br> : | |
| RAPTOR PHARMACEUTICAL CORP., MISNEACH CORPORATION, HORIZON PHARMA PLC, RAYMOND W. ANDERSON, SUZANNE L. BRUHN, RICHARD L. FRANKLIN, GEORGES GEMAYEL, LLEW KELTNER, GREGG LAPOINTE, JULIE ANNE SMITH, CHRISTOPHER M. STARR, | : <br> : | <u>JURY DEMAND</u> |
| Defendants. | : <br> : | |

Plaintiff Roman Lavernov ("Plaintiff"), on behalf of himself and all others similarly situated, by and through his undersigned counsel, alleges the following upon information and belief, including the investigation of counsel and review of publicly available information, except as to those allegations pertaining to Plaintiff, that are alleged upon personal knowledge.

## NATURE OF THE ACTION

1.      This is a stockholder class action brought by Plaintiff on behalf of the public stockholders of Raptor Pharmaceutical Corp. ("Raptor" or the "Company") against the Company and its Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(e) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") to enjoin the expiration of a tender offer on a proposed transaction, pursuant to which Raptor will be acquired by Horizon Pharma Public Limited Company ("Parent") and Misneach

Corporation ("Merger Sub," and together with Parent, "Horizon").  This action also seeks to enjoin the Individual Defendants from further breaching their fiduciary duties in their pursuit of a sale of the Company at an unfair price through an unfair process.

2.     Raptor's stockholders are the latest victims to the short-term pressure on boards of directors created by activist investors.  These activist investors look for companies engaged in turnaround efforts or at a crossroads, buy a significant portion of stock, and then push for the board to sell the company, rather than complete the efforts consistent with its strategic plan.  Sarissa Capital Domestic Fund LP ("Sarissa") followed that game plan exactly with its investment in Raptor.  Rather than standing up to Sarissa and its short-term goals, the Raptor Board caved almost immediately.

3.     Raptor, a biopharmaceutical company, has a single product approved for sale in the United States marketed under the product name PROCYSBI® (investigationally named RP103) for the treatment of nephropathic cystinosis in children and adults.  Raptor's second commercial drug product, QUINSAIR™ (investigationally named MP-376), is approved for sale in the European Economic Area and Canada, and was acquired by Raptor in October 2015.

4.     On September 14, 2015, Raptor announced that it would not advance its program for the treatment of pediatric non-alcoholic steatohepatitis (NASH) with RP103 after topline results of its Phase 2b trial failed to show statistically significant efficacy as measured by the trial's primary endpoints.  On the next trading day following the announcement, the closing price of Raptor's common stock on The NASDAQ Global Market ("NasdaqGM") fell to $7.52 per share, as compared to $12.03 per share closing price on the prior trading day.  The failure sent Raptor's share price down as much as 35%, plunging the biotech's market cap below $1 billion.

5.     On December 10, 2015, Raptor announced 36-month efficacy results from a

Phase 2/3 clinical trial evaluating RP103 for the potential treatment of Huntington's Disease and that Raptor would advance the program into a pivotal study based on favorable treatment effects, notwithstanding that efficacy results from the Phase 2/3 clinical trial, as measured by the trial's primary endpoints, were not statistically significant. The closing price of Raptor's common stock on December 11, 2015 was $4.54 per share, down from $5.56 per share on the prior trading day.

6.      "This clarifies our near-term priorities, which are to maximize the reach of PROCYSBI in nephropathic cystinosis, further the development of RP103 in Huntington's and mitochondrial diseases, prepare for QUINSAIR's launch and initiate at least one trial in nontuberculous mycobacteria or bronchiectasis," said CEO Julie Anne Smith.

7.      While certain of the investing public was now concerned about the continuing viability of Raptor following the NASH failure, others, including Leerink Swann analyst Joseph Schwartz ("Schwartz"), saw this as an opportunity.   In reiterating an Outperform rating on Raptor, Leerink Swann adjusted its price target to $17.00 (from $20.00), and Schwartz issued the following comment: "We would take advantage of today's stock weakness to buy RPTP, as we believe the current valuation ascribes little if any value to the Company's pipeline and the recent QUINSAIR acquisition.   We are encouraged that management has decided not to invest further in NAFLD, and is refocusing its attention on its rare disease assets.   Now that NAFLD data is out of the way, we continue to believe that RPTP has a better opportunity to make a strong case for RP103 in Huntington's Disease (HD), when Cyst-HD data is reported in 4Q15."

8.      Following the decline in value of Raptor stock caused by the NASH results, in Q1 2016, Raptor began facing substantial pressure from its stockholder base to improve its stock price performance.   The Raptor Board and management had increased interactions with large stockholders, and received a letter on March 25, 2016 from Sarissa notifying Raptor of Sarissa's

3

intention to nominate certain persons to the Raptor Board.  At the time of the letter, Sarissa owned approximately 3% of all outstanding shares of Raptor common stock.  By the end of Q2 2016, Sarissa had raised its position in Raptor by 5.5%, and now owns 2,875,000 shares of the Company's stock.

9.      Sarissa's demands were directly from the short-term investors' playbook.  It was demanding that the Board stray from its strategic plan, and cease investment in the long-term future of the Company and instead take steps to provide a short-term boost to Raptor's stock price.  While such moves benefited Sarissa, which purchased its Raptor stock at an average price per share of approximately $5.37, they did not make sense for long-term investors that saw a patent rich company with exciting new products coming to market and/or products with great potential to expand their existing market share.

10.      Rather than stick up for the Company's ordinary stockholders, the Board caved to Sarissa, and on September 12, 2016, Raptor and Horizon announced the definitive Agreement and Plan of Merger (the "Merger Agreement") pursuant to which Horizon will acquire each outstanding common share of Raptor for $9 per share in cash (the "Proposed Transaction" or "Merger").  While the 50-day ($6.52) and 200-day ($5.19) moving averages for Raptor stock are below the $9/share transaction price, a closer look reveals that past the most recent 52 weeks, shares of RPTP have consistently traded at or above the $9/share mark since 2013, with both of the 50-day and 200-day moving averages also well above this $9/share level.

11.      The Proposed Transaction structure is that of an all-cash tender offer that requires as a condition of completion that only a simple majority of Raptor shares be tendered to Horizon at the close of the offer period, at 12:00 midnight, New York City time, at the end of the day on October 24, 2016.  According to the Merger press release, the Merger has an implied fully

diluted equity value of approximately $800 million.

12.     The Proposed Transaction, however, fails to reflect Raptor's true value.  Analyst expectations, historical trading prices, Raptor's recent results, and an exciting pipeline of products that are either on market and/or coming soon to market demonstrate that the Proposed Transaction undervalues the Company.  Significantly, as recently as April 12, 2016, Leerink Swann reaffirmed its Outperform rating on RPTP shares while setting an $11/share price target for Company stock.  Further to this, the Company has grown global net revenue for PROCYSBI in no fewer than ten consecutive quarters, and the terrific launch of QUINSAIR in Europe during the last quarter – the first time that revenue from QUINSAIR has augmented revenue from PROCYSBI – has caused Raptor to revise upward the remainder of the Company's 2016 guidance.

13.     In an attempt to secure stockholder support for the Proposed Transaction, on September 26, 2016, the defendants filed a Recommendation Statement on Schedule 14D-9 (the "Recommendation Statement") with the U.S. Securities and Exchange Commission (the "SEC"). The Recommendation Statement, which recommends that Raptor stockholders tender their stock to Horizon, omits and/or misrepresents material information concerning: (i) the process leading up to the Proposed Transaction; (ii) the financial analyses prepared by its financial advisors, Centerview Partners LLC ("Centerview") and Leerink Partners LLC ("Leereink"); and (iii) the Company's financial projections.

14.     In short, the Proposed Transaction is designed to unlawfully divest Raptor's public stockholders of the Company's valuable assets for grossly inadequate consideration and without fully disclosing all material information concerning the transaction to stockholders.  To remedy defendants' breaches of fiduciary duty and violations of the Exchange Act, Plaintiff

seeks injunctive relief preventing consummation of the Merger, unless and until the Company adequately discloses all material information concerning the transaction.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over the claims asserted herein for violations of Sections 14(e) and 20(a) of the Exchange Act. This Court has supplemental jurisdiction under 28 U.S.C. §1367.

16.     This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Raptor is incorporated in the State of Delaware and each of the Individual Defendants, as Company officers or directors, has extensive contacts within this District.

## THE PARTIES

**Plaintiff**

18.     Plaintiff was a stockholder of Raptor at the time of wrongdoing companied of, has continuously been a stockholder since that time, and is a current Raptor stockholder.

**Defendants**

19.     Defendant Raptor is a Delaware corporation with principal executive offices located at 7 Hamilton Landing, Suite 100, Novato, CA 94949.   Raptor is a global biopharmaceutical company focused on the development and commercialization of transformative therapeutics for rare, debilitating and often fatal diseases.  Raptor common stock is traded on the NasdaqGM under the symbol "RPTP".

20.     Defendant Raymond W. Anderson ("Anderson") has served on the Board of the

Company since September 2009. Anderson served as Chief Operating Officer and Chief Financial Officer at BioMarin Pharmaceutical Inc. from June 1998 to January 2002.

21. Defendant Suzanne L. Bruhn has served on the Board of the Company since April 2011.

22. Defendant Richard L. Franklin has served on the Board of the Company since September 2009.

23. Defendant Georges Gemayel has served on the Board of the Company since January 2015.

24. Defendant Llew Keltner has served on the Board of the Company since September 2009.

25. Defendant Gregg Lapointe ("Lapointe") has served on the Board of the Company since January 2015, and has been Chairman of Raptor's Board since August 2015.

26. Defendant Julie Anne Smith ("Smith") serves as Raptor's President and CEO and is a member of the Board. Smith joined the Company in 2012 as Executive Vice President, Strategy and Chief Operating Officer.

27. Defendant Christopher M. Starr ("Starr") is a co-founder of Raptor and has served as the Chief Executive Officer and director therof since its inception in 2006. Starr resigned as CEO of Raptor in December 2014. Starr co-founded BioMarin Pharmaceutical Inc. in 1997 where he last served as Senior Vice President and Chief Scientific Officer prior to leaving to start Raptor in 2006. As Senior Vice President at BioMarin, Dr. Starr was responsible for managing a Scientific Operations team of 181 research, process development, manufacturing and quality personnel through the successful development of commercial manufacturing processes for its enzyme replacement products, and supervised the cGMP design, construction and licensing of

BioMarin's proprietary biological manufacturing facility. From 1991 to 1998, Dr. Starr supervised research and commercial programs at BioMarin's predecessor company, Glyko, Inc., where he served as Vice President of Research and Development.

28.     The defendants identified in ¶¶ 20 - 27 are collectively referred to as the Individual Defendants and/or the Board.

29.     Defendant Parent is a biopharmaceutical company focused on improving patients' lives by identifying, developing, acquiring and commercializing differentiated and accessible medicines that address unmet medical needs.  Parent markets nine medicines through its orphan, rheumatology and primary care business units.  Parent's global headquarters are in Dublin, Ireland.

30.     Defendant Merger Sub is a Delaware corporation and an indirect wholly owned subsidiary of Parent.

31.     Defendants Raptor, the Individual Defendants, Parent, and Merger Sub are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

*Raptor Company Profile and Background*

32.     Raptor Pharmaceuticals (NASDAQ: RPTP) is a commercial-stage, global biopharmaceutical company committed to developing and commercializing life-altering therapeutics for orphan diseases.  Raptor's focus is to help patients with rare, debilitating, and potentially fatal diseases by leveraging the Company's deep understanding of cellular metabolic pathways to develop medicines that address serious unmet medical needs.

33.     Indicative of its commitment, Raptor has extensively invested in its portfolio, including its two approved products, PROCYSBI® and QUINSAIR™, in order to bring breakthrough therapies to patients in need of new treatment options.

**RP103**

34.     Twice-a-day   PROCYSBI (cysteamine    bitartrate)   delayed-release   capsules received FDA approval in April 2013 for the management of nephropathic cystinosis in adults and children six years and older and is the first product Raptor Pharmaceuticals, brought to market.  The label was expanded for children as young as two in August 2015.  In Europe, PROCYSBI gastro-resistant hard capsules of cysteamine (as mercaptamine bitartrate) received European Commission approval in September 2013 for the treatment of proven nephropathic cystinosis.

35.     The PROCYSBI molecule, RP103, is currently in development for several additional indications:

- Huntington's disease; and

- Mitochondrial Diseases.

36.     Huntington's disease (HD) is a rare but devastating neurodegenerative disorder characterized by jerky, involuntary movements called chorea, impairment in voluntary motor function, behavioral changes, and dementia.[1]  HD is caused by an inherited mutation in a gene called huntingtin, and any child of an affected person has a 50% chance of inheriting the disease.[2] The prevalence of HD is 5.70 per 100,000 people in North America, Europe, and Australia, but this prevalence is reduced to 0.40 per 100,000 people in Asian populations, most

---

[1]  Shannon KM, Fraint A. Therapeutic advances in Huntington's disease. Mov Disord. 2015:30:1539-46.

[2] Pringsheim T, Wiltshire K, Day L, et al. The incidence and prevalence of Huntington's disease: a systematic review and meta-analysis. Mov Disord. 2012; 27:1083-91.

likely due to genetic variations.[3] Global prevalence has been estimated at 2.71 people per 100,000.[4] There is also evidence to suggest that the prevalence of HD will continue to rise as a result of new mutations, which are thought to account for approximately 10% of diagnosed cases. Symptoms of HD progress gradually over the span of about 15-20 years, eventually leading to severe physical and mental disability, and potentially early death.[5] There are currently no approved drugs that modify the course of this disease, nor any therapies to slow the rate of clinical decline.[6]

37.     RP103 is currently being evaluated as a potential disease-modifying treatment for HD in a Phase 2/3 clinical trial.

38.     Raptor holds U.S. orphan drug designation(s) for RP103 in Huntington's disease and intellectual property for the use of cysteamine in Huntington's disease and other neurodegenerative disorders including Parkinson's disease, Rett Syndrome, and MeCP2-associated disorders.

**MP-376**

39.     The second Raptor product, QUINSAIR, received marketing authorization by the European Commission in March 2015 and Health Canada in June 2015 for the management of

---

[3] *Id.*

[4] *Id.*

[5] Dayalu P, Albin RL. Huntington disease: pathogenesis and treatment. Neurol Clin. 2015; 33:101-14.

[6] Prundean A, Youssov K, Humbert S, et al. A phase II, open-label evaluation of cysteamine tolerability in patients with Huntington's disease. Mov Disord. 2015; 30:288-9.

chronic pulmonary infections due to *Pseudomonas aeruginosa* in adults with cystic fibrosis. QUINSAIR, a twice-a-day treatment, contains levofloxacin, a proven antimicrobial active against a wide range of gram negative and gram positive bacteria.  Raptor plans to launch QUINSAIR in Europe and Canada in the first half of 2016 and to discuss with the FDA the path to approval in the U.S. in 2016.

40.     With activity against a broad spectrum of bacteria, QUINSAIR has the potential for development in additional orphan diseases with unmet need, including:

- Bronchiectasis (BE); and

- Nontuberculous mycobacteria (NTM) lung infections.

41.     Cystic fibrosis (CF) is a rare, life-threatening genetic disease affecting more than 30,000 in the US, more than 32,000 in the EU, and 70,000 people worldwide.[7]  It is an inherited disorder that occurs in roughly 1 in 3000 white Americans, 1 in 4000-10000 Latin Americans, and about 1 in 15,000 African Americans.[8]  CF is the result of a mutation in the cystic fibrosis transmembrane conductance regulator (CFTR) gene.[9]  Defective or missing CFTR proteins lead to the buildup of thick, dehydrated secretions in the lungs and other vital organs that can harbor infectious bacteria, including Pseudomonas aeruginosa.[10]  Chronic airway infections leading to a

---

[7] Hurley MN, McKeever TM, Prayle AP, et al. Rate of improvement of CG life expectancy exceeds that of general population – Observational death registration study. J Cyst Fibros. 2014; 13:410-15.

[8] O'Sullivan BP, Freedman SD. Cystic Fibrosis. 2009; 373:1891-904.

[9] *Id.*

[10] *Id.*

decline in lung function are responsible for at least 80% of cystic fibrosis-related deaths.[11]   One of the most important factors in improving lung health in patients with CF is the early detection and effective eradication of P. aeruginosa, in addition to chronic suppressive therapy in patients with chronic P. aeruginosa infections.[12]

42.     A number of clinical trials have been completed that evaluated the efficacy and safety of MP-376 in cystic fibrosis patients with chronic P. aeruginosa infections.[13] [14] [15]   MP-376 received marketing authorization by the European Commission and Health Canada in March 2015 and June 2015, respectively, for the management of chronic pulmonary infections due to P. aeruginosa in adults with cystic fibrosis.   Raptor is evaluating the potential of MP-376 in pediatric populations, with possible initiation of clinical programs in 2016.

### Preclinical and Clinical Development Pipeline

43.     Raptor has active clinical development programs in multiple therapeutic areas, in addition to those for RP103 and MP-376 noted above.

44.     Convivia® (oral 4-methylpyrazole) is in Phase 2 development for the potential management of acetaldehyde toxicity due to ALDH2 deficiency, an inherited metabolic disorder

---

[11] *Id.*

[12] Lenney W. *Pseudomonas aeruginosa* in cystic fibrosis is potentially serious, and more than merely a marker for disease severity.  *Paediatr Respir Rev.* 2015; 16(Suppl 1):35-6.

[13] Geller DE, Flume PA, Staab D, et al. Levofloxacin inhalation solution (MP-376) in patients with cystic fibrosis with *Pseudomonas aeruginosa.*   *Am J Respir Crit Care Med.* 2011; 183:1510-6.

[14] ClinicalTrials.gov: Trial of Aeroquin Versus Tobramycin Inhalation Solution (TIS) in Cystic Fibrosis (CF) Patients.

[15] ClincalTrials.gov: MP-376 (Aeroquin, Levofloxacin for Inhalation) in Patients with Cystic Fibrosis.

that affects 40-50 percent of East Asian populations.  Raptor has an exclusive license agreement with Uni Pharma Ltd., a Taiwanese pharmaceutical company, to develop and commercialize Convivia in Taiwan.

45.     The rest of the pipeline looks promising in light of the current market cap and the market potential for some of these products.



46.     Raptor believes that the two additional indications for QUINSAIR (MP-376) represent a $1 billion a year market opportunity.  RP103 in Huntington's also represents a large market opportunity.  Prior to the Merger announcement, Raptor was said to be seeking a partner for phase 3 trials for RP103 in Huntington's.  The upside potential from any of these potential indications is significant and would unlock meaningful shareholder value in the following years.

**Financial Performance**

47.     Raptor has a demonstrated history of financial success, evidenced by its most recent quarterly financial results.  On February 25, 2016, Raptor released its Q4 2015 and full year 2015 financial results.  Global net revenue for PROCYSBI® was $24.7 million for the fourth quarter ended December 31, 2015 compared to $17.3 million for the same period in 2014, representing 43% growth quarter-over-quarter. Global net revenue for PROCYSBI for the full year 2015 was $94.2 million compared to $69.5 million, representing 36% growth year-over-year.  "PROCYSBI sales were strong in 2015, driven by significant product demand and compliance," said defendant Smith, President and CEO of Raptor Pharmaceutical.  "This year, in addition to anticipating continued solid commercial execution for our foundational PROCYSBI franchise, we look forward to launching QUINSAIR in Europe and Canada and advancing other pipeline initiatives."

48.     In addition to the growing revenue of PROCYSBI during the final quarter of 2015, Raptor also completed its acquisition of QUINSAIR in October 2015.  As discussed *supra,* QUINSAIR has received marketing authorization in Europe and Canada for the management of chronic pulmonary infections due to *Pseudomonas aeruginosa* in adults with cystic fibrosis.

49.     Raptor released Q1 2016 financial results on May 5, 2016 that again saw strong revenue growth for PROCYSBI.  PROCYSBI's revenues increased 34% Y/Y to $27.5 million in Q1 and revenues outside of the U.S. rose 81% (though the actual number was not reported).  The Company plans to expand to more EU countries and in Canada, assuming PROCYSBI is approved in Q4 2016.  At the end of Q1, Raptor had $132 million in cash and equivalents. The company guided for FY 2016 revenues between $115 million and $125 million and for cash expenses in the range of $125 million to $135 million.

14

50.     Speaking on these successful results, defendant Smith stated:

Raptor achieved several significant milestones during the quarter, underscoring the progress we are making in building a premiere rare disease company. PROCYSBI continues to deliver strong growth as a result of significant market penetration and continued high levels of patient compliance and we now look forward to revenues from the commercialization of QUINSAIR™.   We are focused on prioritizing key clinical programs to drive growth and being measured with our investments in selected development to extend our cash runway.   As a result we are adjusting our non-GAAP cash operating expense guidance favorably for 2016. We look forward to continuing momentum as we work to bring QUINSAIR™ to patients in Europe and Canada, to make progress towards an NDA filing for MP-376 in cystic fibrosis (CF) and to initiate a Phase 2 MP-376 study in non-cystic fibrosis bronchiectasis (BE).

51.     During Q1 2016 four new patents related to PROCYSBI® were listed in the Orange Book during the quarter, bringing the total number of Orange Book-listed patents to five. In addition, PROCYSBI® was granted additional U.S. orphan exclusivity in the two-to-six year old nephropathic cystinosis population until August 2022.

52.     Moreover, in March 2016, MP-376 received Qualified Infectious Disease Product (QIDP) designation for three distinct indications: the treatment of chronic pulmonary infections due to *Pseudomonas aeruginosa*, in patients with CF and in patients with BE, and in patients with nontuberculous mycobacteria infections (NTM).   QIDP designation confers five years exclusivity under the Hatch-Waxman Act, which, in the case of CF, would be added to the seven years of orphan exclusivity for a total potential of 12 years of exclusivity, if approved for the indication.

53.     Finally, Raptor also reported in March 2016 that Health Canada accepted the new drug submission for PROCYSBI® in nephropathic cystinosis with Priority Review, which provides for a shortened review period of 180 days, compared to a standard review of 300 days. If approved, the shorter review time is expected to enable Raptor to bring PROCYSBI® to market faster in Canada.

54.     Most recently, on August 4, 2016, Raptor released Q2 2016 financial results. Global net product revenue was $32.0 million for the second quarter ended June 30, 2016, a 37.3% increase compared to $23.3 million for the same period in 2015.   "I'm delighted that we delivered another record quarter for sales, driven primarily by growing patient demand for PROCYSBI," said defendant Smith, President and CEO of Raptor.   "For the first time, PROCYSBI revenue was augmented by sales of QUINSAIR, which is off to a terrific launch in Europe. ***Based on our outstanding commercial performance, we are pleased to raise our 2016 revenue guidance.   We look forward to continued growth from both products*** and supporting patients living with rare diseases and with limited options." (Emphasis added.)

55.     In addition, in April 2016, Raptor commenced the first commercial sales of QUINSAIR in Germany and Denmark for the management of chronic pulmonary infections due to *Pseudomonas aeruginosa* in adult patients with cystic fibrosis.   To date, approval for reimbursement for QUINSAIR has been achieved in numerous European countries.   With respect to QUINSAIR, Raptor is targeting $35 million to $40 million in annual revenues in the EU and Canada by 2019 and $150 million to $250 million worldwide if approved in the U.S.

***The Sales Process Leading to the Proposed Transaction***

56.     From time to time, over the last several years, the Raptor Board and senior management have periodically evaluated potential strategic alternatives relating to Raptor's business and engaged in discussions with third parties concerning potential strategic transactions, including a sale of the company and collaboration and licensing arrangements with respect to its products, product candidates and technology.   Such discussions included preliminary discussions from three unsolicited parties in the first quarter of 2016 following the drop in Raptor's trading price.

57.     Defendant Smith, the President and Chief Executive Officer of Raptor, and Michael Smith, the Chief Financial Officer of Raptor, met with representatives of a European biopharmaceutical company ("Company A") at an industry conference on January 13, 2016 and discussed potential strategic opportunities between the two companies.  This initial discussion centered around potential opportunities for Company A to acquire rights to Raptor's products in Europe.

58.     On January 28, 2016, senior executives of a publicly traded biotechnology company in the United States ("Company B") contacted defendant Smith and certain other members of the senior management team of Raptor to discuss a potential merger in a stock-for-stock transaction (the "Potential Stock Transaction") between the two parties.  In early February, Raptor entered into a confidentiality agreement with Company B, which included a customary two-year standstill provision (including a provision prohibiting Company B from making any request that Raptor waive the standstill restrictions, known as a "don't ask/don't waive" provision).

59.     On February 8-9, 2016, the Board met with the Company's management and representatives of the Company's outside counsel, Latham & Watkins LLP ("Latham"), to discuss the Company's potential engagement of Centerview to provide financial advice and services to the Company relating to activist stockholder matters and the potential evaluation and valuation of the Company and potential strategic and financial alternatives.  At the meeting, the Raptor Board did not then make a determination regarding whether to conduct a review of strategic alternatives or engage a financial advisor in connection with any such review.

60.     On March 8, 2016, representatives of Raptor's senior management further discussed with representatives of Company A potential strategic opportunities between the two

companies. During this discussion, Company A expressed an interest in acquiring all of the outstanding shares of Raptor Common Stock at a premium based on Raptor's then-current market price, which as of the close of trading on March 8, 2016 was $3.99 per share.

61.     After the announcement of the dividend the following day, various third parties began contacting Morgan Stanley and the Company regarding exploring a potential transaction with the Company.

62.     On March 14 and 15, 2016, and without prior solicitation from Raptor or its advisors, representatives of MTS Health Partners, L.P. ("MTS"), one of Horizon's financial advisors, contacted defendant Smith to discuss a preliminary proposal for a potential acquisition of PROCYSBI / RP103 at a purchase price of $500 to $600 million, with Raptor to retain rights to develop PROCYSBI / RP103 for the treatment of Huntington's Disease.

63.     On March 17, 2016, Timothy P. Walbert ("Walbert"), the Chairman, President and Chief Executive Officer of Horizon and a former member of the Raptor Board, met with defendant Smith at a banking conference and reiterated Horizon's interest in exploring an acquisition of PROCYSBI / RP103 (with Raptor to retain rights to develop PROCYSBI / RP103 for the treatment of Huntington's Disease).  Defendant Smith expressed some concerns regarding the amount of cash that would be available to Raptor to pursue its development and commercialization of QUINSAIR and its product pipeline following the consummation of the proposed transaction.  Walbert served as a member of the Raptor Board from April 2011 until July 28, 2014, and as a result, was familiar with Raptor management and its lead drug, PROCYSBI / RP103.  Under the potential structure referenced by Walbert, Horizon would acquire all assets related to PROCYSBI / RP103 and Raptor would retain rights to develop PROCYSBI / RP103 for the treatment of Huntington's Disease and its other commercial drug

product, QUINSAIR™ / MP-376.

64.     On March 23, 2016, the executive teams of Raptor and Company B met to discuss the benefits that might potentially be realized by both companies in connection with the Potential Stock Transaction.  In light of this discussion and the strategic interest received from these various parties, the Raptor Board decided to engage Centerview to assist Raptor in connection with the Potential Stock Transaction with Company B.  On March 23, 2016, Raptor executed an engagement agreement with Centerview to act as lead financial advisor to Raptor to assist in connection with a potential transaction with Company B, and with the possibility of expanding Centerview's advisory role in the future in the event Raptor decided to explore other strategic alternatives.

65.     At an in-person meeting of the Raptor Board held on April 6, 2016, with representatives of management, Centerview and Latham present, defendant Smith updated the Raptor Board regarding strategic discussions with each of Company A, Company B and Horizon.  Without Centerview present, the Raptor Board discussed the selection of one or more financial advisors who could advise the Raptor Board in connection with its evaluation of potential strategic alternatives (beyond the exploration of the Potential Stock Transaction with Company B for which Centerview had already been engaged) and determined that Centerview was qualified for this expanded role.  Following discussion, the Raptor Board authorized management to expand Centerview's engagement as a financial advisor to Raptor in connection with its broader review of strategic alternatives. The Recommendation Statement indicates that the Raptor Board also discussed the advantages of engaging a potential co-lead financial advisor to assist Raptor in its evaluation of and response to strategic alternatives, but fails to reference what, if any the advantages were.  At that meeting, the Raptor Board and representatives of

management interviewed representatives of three financial advisory firms, including Leerink, but deferred making a decision whether to hire a second financial advisor.

66.     During the course of the trading day on April 6, 2016, a rumor appeared in various media outlets claiming that Raptor was considering hiring a financial advisor to explore a potential sale.  That day, Walbert emailed defendant Smith to ask whether Raptor was exploring a potential sale of the entire company, and defendant Smith responded by email that Raptor was continually reviewing options to create value for its stockholders.

67.     On April 19, 2016, the Chief Executive Officer of Company A sent a letter to defendant Smith expressing Company A's interest in acquiring all of the issued and outstanding shares of Raptor's common stock, and indicating a preliminary equity valuation of $582 million to $671 million (or $6.50 to $7.50 per share).

68.     On April 24, 2016, Horizon's indication of interest was confirmed in writing via a letter addressed from Walbert to defendant Smith, proposing an acquisition of the PROCYSBI assets for $500 to $600 million in cash, plus an unquantified amount of risk-sharing consideration to be negotiated for the possible use of PROCYSBI for the treatment of Huntington's Disease, subject to the terms of an asset purchase agreement to be drafted and negotiated.

69.     On May 16-17, 2016, the Raptor Board held in-person meetings, with management and representatives of Latham and Centerview present, during which Centerview provided the Raptor Board with an overview of a proposed process for a review of potential strategic alternatives by Raptor, focusing on a potential sale of the company, the Potential Stock Transaction and the possibility of a divestiture by Raptor of its businesses in Europe, the Middle East and Africa ("EMEA Divestiture").  The Recommendation Statement again states that the

Raptor Board also discussed in executive session the potential advantages of engaging a financial co-advisor to provide advice in connection with Raptor's review of potential strategic alternatives but again failed to identify any such perceived advantage. Nevertheless, the Raptor Board authorized Raptor's officers to retain and engage Leerink to serve as co-lead financial advisor to Raptor in connection with the exploration of strategic alternatives. At no point are the roles of Leerink and Centeview adequately explained or why the Company needed to spend millions more in advisor fees only to have the two advisors create a joint financial analysis.

70.     At the May 16-17, 2016 meeting, management also reviewed a number of business updates with the Raptor Board and then presented the Non Risk-Adjusted All Programs Long-Term Forecast. At the conclusion of the May 16-17, 2016 meeting, the Raptor Board authorized Centerview and Leerink to begin a strategic review of alternatives on behalf of Raptor and to communicate with each of Horizon, Company A, Company B and other potentially interested parties regarding their interest in potential strategic opportunities, focusing on a potential sale of the company, the Potential Stock Transaction and an EMEA Divestiture. In addition, in order to facilitate the Raptor Board's oversight of the process, the Raptor Board formed a transaction committee (the "Committee"), which consisted of Smith, defendant Richard Franklin and defendant Suzanne Bruhn, to oversee and manage the review and assessment of strategic alternatives in conjunction with management and to provide guidance to Raptor's senior management and legal and financial advisors, with the Raptor Board to be convened to consider and make any key decisions in connection with the review process.

71.     On May 20, 2016, the Committee held a telephonic meeting, with representatives of Latham, Centerview and Leerink and other members of the Raptor Board and management present, to discuss the process and timeline for outreach to potential strategic counterparties who

might be interested in an acquisition of Raptor, the EMEA Divestiture or the Potential Stock Transaction. Centerview and Leerink reviewed a list of 42 potential strategic counterparties with the Company.  The 42 potential parties did not include any financial investors.

72.     After the May 20 Committee meeting, in consultation with the Committee, Centerview and Leerink began outreach to 14 prioritized strategic counterparties, including each of Horizon, Company A and Company B, who the Committee had determined might be potentially interested in either an acquisition of Raptor, the Potential Stock Transaction or an EMEA Divestiture.  At the request of the Committee and other members of the Raptor Board during periodic updates to the Committee, six additional strategic counterparties were ultimately added to this outreach process. This included two parties that independently contacted Centerview and Leerink without solicitation, following rumors in the press that Raptor was considering hiring a financial advisor to explore a potential sale, to express interest in participating in the sale process.

73.     On May 23, 2016, Mr. Walbert called Ms. Smith to discuss Horizon's proposal to acquire PROCYSBI / RP103. Ms. Smith informed Mr. Walbert that the Raptor Board did not believe that Horizon Pharma's prior proposal to acquire PROCYSBI / RP103 was in the best interest of Raptor's stockholders.

74.     Of the 20 strategic parties contacted by Centerview and Leerink, 12 parties, including each of Horizon, Company A and Company B, executed a confidentiality agreement with Raptor, were provided opportunities to participate in management meetings and were granted access to select due diligence materials via an electronic data room.

75.     Of the 12 parties that executed confidentiality agreements with Raptor, five parties (including Horizon) expressed during the course of various discussions that they were

primarily interested in an acquisition of the company, six parties (including Company A) expressed that they were primarily interested in an EMEA Divestiture and Company B remained interested in the Potential Stock Transaction.

76.     In late June 2016, at the direction of the Raptor Board, Centerview and Leerink sent a process letter requesting that proposals for strategic transactions with Raptor be submitted on or before July 14, 2016.

77.     On July 14, 2016, each of Horizon, Company A and Company B submitted an indication of interest in connection with Raptor's strategic process. Horizon's proposal contemplated an acquisition of 100% of the outstanding shares of common stock for up to $8.00 per share, consisting of $7.00 per share payable in cash at closing and $1.00 per share in the form of a contingent value right payable upon QUINSAIR cumulative net sales in the United States of $224 million by the end of 2020. Company A's proposal was for Raptor's assets and business in the European Union and offered $40 million of consideration payable in cash at closing, $177.5 million payable on the achievement of various development and net sales milestones for PROCYSBI / RP103 in Europe and $177.5 million payable on the achievement of various development and net sales milestones for QUINSAIR / MP-376 in Europe. In conjunction with that proposal, Company A also withdrew its prior indication of interest submitted on April 19, 2016 which contemplated an acquisition of all of the issued and outstanding shares of common stock and indicated it was only interested in an acquisition of Raptor's business in Europe, the Middle East and Africa. Company B's proposal was for the Potential Stock Transaction and contemplated an acquisition of 100% of the issued and outstanding shares of Raptor's common stock for $7.00 per share, comprised of $1.00 per share in cash and $6.00 per share payable in shares of Company B common stock to be issued at the closing of the transaction. Company B

also indicated that it would be amenable to increasing the proportion of cash used in the transaction, should that be of interest to the Raptor Board, contingent upon the restructuring of some or all of Raptor's indebtedness to Healthcare Royalty Partners under terms agreeable to both parties and in a manner supportive of the pro forma company's liquidity and available resources. The closing price of Raptor's Common Stock on July 14, 2016 was $5.86 per share. The other nine parties that had participated in management presentations declined to submit initial indications of interest for various reasons, including other internal strategic priorities and recent acquisitions.

78.     On July 20, 2016, representatives of Centerview and Leerink called representatives of Citi Global Markets Inc. ("Citi") and MTS, the financial advisors to Horizon, to provide feedback on Horizon's July 14 proposal, including that the Raptor Board did not find the proposal to be compelling, the process was competitive and that the Raptor Board was not prepared to move forward with Horizon into the next round based on that proposal.

79.     On July 26, 2016, Horizon submitted a revised non-binding proposal to acquire 100% of the outstanding shares of Common Stock for up to $9.00 per share, consisting of $8.50 per share payable in cash at closing and up to $0.50 in the form of a contingent value right related to QUINSAIR. Horizon's revised proposal specified that each contingent value right would pay to the holder thereof $0.25 upon FDA approval for QUINSAIR for cystic fibrosis in the United States, assuming approval is received no later than by the end of 2018, and an additional $0.25 upon achieving $100 million of net sales of QUINSAIR in the United States in any one fiscal year period prior to the end of 2021.

80.     On August 6, 2016, Company C submitted a non-binding proposal, conditioned on completion of its due diligence process, to acquire all outstanding shares of Raptor's common

24

stock for an aggregate cash amount of $775 million at closing, which implied a per share value of $8.71.

81.     On August 12, 2016, at the direction of the Raptor Board, Centerview and Leerink instructed each of Horizon, Company A, Company B and Company C to provide best and final offers.

82.     On September 8, 2016, a representative of Citi indicated Horizon's final proposal was to acquire 100% of the outstanding shares of common stock for $9.00 per share in cash payable at closing.  On the same day, MTS called Centerview and informed Centerview that the September 8 proposal was Horizon's "best and final" offer and that Horizon would not be providing any additional consideration.

83.     On September 8, 2016, Company A also submitted a revised proposal for an EMEA Divestiture. Company A's final proposal for the EMEA Divestiture offered $45 million of consideration payable in cash at closing, $193 million payable on the achievement of various development and net sales milestones for PROCYSBI / RP103 in the European Union and $200 million payable on the achievement of various development and net sales milestones for QUINSAIR / MP-376 in the European Union. Company B and Company C did not submit final proposals.

84.     On September 9, 2016, representatives of Centerview and Leerink then reviewed with the Raptor Board certain preliminary financial analyses of Raptor based on the $9.00 offer price in Horizon's latest proposal.  Following discussion and claiming to take into account the significant risks and speculative nature of the contingent consideration included in Company A's proposal for the EMEA Divestiture, the Raptor Board instructed management and its advisors to finalize the terms of the sale of Raptor to Horizon at its final offer price and to negotiate to

eliminate conditionality associated with Horizon's debt financing.  The closing price of Raptor's Common Stock on September 9, 2016 was $7.45 per share.   Following the Raptor Board meeting, on September 12, 2016, Horizon, Merger Sub and Raptor entered into the Merger Agreement, and the directors and executive officers of Raptor entered into the Tender and Support Agreements with Horizon with respect to the offer and the Merger.

### The Proposed Transaction

85.   On September 12, 2016, Raptor announced that it had agreed to be acquired for $9.00 per share in the Proposed Transaction.  The press release reads in relevant part:

> DUBLIN, IRELAND and NOVATO, Calif. – September 12, 2016 – Horizon Pharma plc (NASDAQ: HZNP) and Raptor Pharmaceutical Corp. (NASDAQ: RPTP) today announced the companies have entered into a definitive agreement under which Horizon Pharma will acquire all of the issued and outstanding shares of Raptor Pharmaceutical Corp. common stock for $9.00 per share in cash, for an implied fully diluted equity value of approximately $800 million. The transaction is expected to close in the fourth quarter of 2016.
>
> "The proposed acquisition of Raptor furthers our commitment to helping people with rare diseases and is a significant step in advancing our strategy to expand our rare disease business," said Timothy P. Walbert, chairman, president and chief executive officer, Horizon Pharma plc. "Along with the potential for accelerated revenue growth, the addition of Raptor strengthens our U.S. orphan business and provides a platform to expand our orphan business in Europe and other key international markets. We look forward to working with new patient communities and building on the success of the Raptor team."
>
> **Strategic and financial benefits of the transaction:**
>
> •   Strengthens Horizon's focus on rare diseases and provides expansion into Europe and other international markets.
>
> •   Adds PROCYSBI® delayed-release capsules and QUINSAIR™ (aerosolized form of levofloxacin) global rights, with PROCYSBI having strong patent protection through 2034.
>
> •   Diversifies revenue with 11 medicines across three business units: orphan, rheumatology and primary care.
>
> •   Bolsters rare disease revenue, which in the first half of 2016 on a pro-forma basis was 45 percent of total Horizon Pharma revenue.

- Expected to be accretive to adjusted EBITDA in 2017.

"This transaction will deliver significant and immediate value to our shareholders through a compelling all-cash premium and provide ongoing value to our patients, their families and the physicians who treat them," said Julie Anne Smith, president and chief executive officer, Raptor Pharmaceutical Corp. "On behalf of the Board and management team, I extend our deepest gratitude to everyone at Raptor for their unrelenting commitment to advancing the development of our medicines and their tireless work with the patients we serve."

PROCYSBI is the first cystine-depleting agent given every 12 hours that is approved in the United States for the treatment of nephropathic cystinosis (NC), a rare metabolic disorder, in adults and children 2 years of age and older. PROCYSBI received European Commission approval as an orphan medicinal product in September 2013 for the treatment of proven NC. According to estimates, NC prevalence is as high as 1 in 100,000 live births. There are believed to be approximately 550 NC patients in the United States and 2,000 worldwide.

QUINSAIR is a proprietary inhaled formulation of levofloxacin, approved in the European Union and Canada for the management of chronic pulmonary infections due to Pseudomonas aeruginosa in adult patients with cystic fibrosis. Cystic fibrosis is a rare, life-threatening, genetic disease affecting an estimated 21,000 adults in Europe and Canada. QUINSAIR is not approved in the United States.

Raptor's previously disclosed total net sales guidance for full-year 2016 is $125 million to $135 million, which includes both PROCYSBI and QUINSAIR. Horizon will provide additional detail regarding its guidance for full year 2017 net sales and adjusted EBITDA in the first quarter 2017.

**Transaction Terms and Approvals**

The acquisition is structured as an all cash tender offer for all the issued and outstanding shares of Raptor common stock at a price of $9.00 per share followed by a merger in which each remaining untendered share of Raptor common stock would be converted into the $9.00 per share cash consideration paid in the tender offer. The transaction, which has been unanimously approved by the boards of directors of both companies, is subject to the satisfaction of customary closing conditions and regulatory approvals, including antitrust approval in the United States.

**Financing**

Horizon intends to finance the transaction through $675 million of external debt along with cash on hand. The company has put in place fully committed financing with BofA Merrill Lynch, JPMorgan Chase Bank, N.A., Jefferies Finance LLC, and Cowen Structured Holdings, an affiliate of Cowen and Co. LLC. As of June 30, 2016, the company had $424.5 million of cash and cash equivalents on its balance sheet.

**Advisors**

MTS Health Partners L.P. and Citigroup Global Markets Inc. are co-lead financial advisors to Horizon Pharma in the transaction. BofA Merrill Lynch, J.P. Morgan, Jefferies LLC and Cowen and Company, LLC are financial advisors to Horizon Pharma in the transaction. Horizon Pharma's legal advisors are Cooley LLP and McCann FitzGerald.

Centerview Partners LLC and Leerink Partners LLC are financial advisors to Raptor Pharmaceutical Corp. in the transaction. Raptor Pharmaceutical Corp.'s legal advisor is Latham & Watkins LLP.

### The Inadequate Merger Consideration

86.     The Proposed Transaction fails to reflect Raptor's true value.   Analyst expectations, historical trading prices, Raptor's recent financial results, and an exciting pipeline of products that are either on market and/or coming soon to market demonstrate that the Proposed Transaction undervalues the Company.

87.     Significantly, as recently as April 12, 2016 Leerink Swannb had reaffirmed its Outperform rating on RPTP shares while setting an $11/share price target for Company stock. Moreover, between January 2013 and September 2015, Raptor stock consistently traded well above the merger consideration including reaching an intraday trading high of $16.18 on February 7, 2014.  During this period of time up until September 14, 2015, Raptor's 50-day and 200-day moving averages never dipped below the $9/share transaction price.

88.     Raptor's recent financial performance also merits a higher acquisition price. Raptor has grown global net revenue for PROCYSBI in no fewer than ten consecutive quarters, and the terrific launch of QUINSAIR in Europe during the last quarter has caused Raptor to revise upward the remainder of the Company's 2016 guidance, "***[b]ased on our outstanding commercial performance, we are pleased to raise our 2016 revenue guidance***," stated defendant Smith in her remarks regarding the Company's most recent quarterly performance. (Emphasis added).  This year is the first time in the Company's history that the Raptor has

generated concurrent revenue from its two commercially approved products, QUINSAIR and PROCYSBI. While PROCYSBI has already received approval in the United States, the approval of QUINSAIR for use in the United States is likely still one year away. Nevertheless, approval of the drug for use in the United States creates significant growth opportunities.

89.     Further, QUINSAIR has the potential for development in additional orphan diseases with unmet needs. Raptor believes that the additional indications for QUINSAIR (MP-376) represent a $1 billion a year market opportunity.

90.     Similar QUINSAIR, PROCYSBI in Huntington's also represents a large market opportunity. Prior to the Merger announcement, Raptor was said to be seeking a partner for phase 3 trials for RP103 in Huntington's. The upside potential from any of these potential indications is significant and would unlock meaningful shareholder value in the following years.

91.     In addition to QUINSAIR and PROCYSBI, Raptor is also in the development and testing phase for its product, Convivia® (oral 4-methylpyrazole). Convivia is in Phase 2 development for the potential management of acetaldehyde toxicity due to ALDH2 deficiency, an inherited metabolic disorder that affects 40-50 percent of East Asian populations. Raptor has an exclusive license agreement with Uni Pharma Ltd., a Taiwanese pharmaceutical company, to develop and commercialize Convivia in Taiwan. By entering into the Proposed Transaction, Plaintiff and the Class will be unable to share in the Company's future opportunities for growth that are presented by the additional indications that exist for currently approved product, the additional approval for use of existing product in new territories, and the future approval of Convivia and other products in the Company's pipeline.

92.     The compensation contemplated in the Proposed Transaction also fails to compensate Raptor shareholders for the significant synergies Horizon will benefit from as a

result of the Merger.  Among the benefits that Horizon is looking to add to its portfolio, the

company will diversify its revenue with 11 medicines across three business units: orphan,

rhematology and primary care.

93.     Walbert, Chairman, President and CEO of Horizon, commented:

The proposed acquisition of Raptor furthers our commitment to helping people
with rare diseases and is a significant step in advancing our strategy to expand our
rare disease business. Along with the potential for accelerated revenue growth, the
addition of Raptor strengthens our U.S. orphan business and provides a platform
to expand our orphan business in Europe and other key international markets.

94.     In the *SeekingAlpha* article, "Did Horizon Underpay for Raptor?" the author

concludes, "I think Raptor was a bargain at $9 per share. The Company's peak sales expectations

for PROCYSBI are significantly above mine and the deal assigns no value to the pipeline. The

acquisition strengthens Horizon's EU orphan infrastructure and should help accelerate Ravicti's

growth in the EU in 2017 and beyond."  The stark reality Raptor investors are being force-fed by

Defendants is that, despite a year in which Company revenues have grown consecutively and by

record proportions, their Company is now worth 25% less that what it traded it just a short time

ago.

95.     The Proposed Transaction will foreclose upon Plaintiff and other public

stockholders of the Company the ability to see a return on their investment that, by all

indications, otherwise would have been very near.

***Potential Conflicts of Interest***

96.     It appears that the Individual Defendants may have been motivated by their own

self-interest to agree to the Proposed Transaction.  Notably, pursuant to the terms of the Merger

Agreement, each Company Option that is outstanding as of immediately prior to the Effective

Time will accelerate and become fully vested and exercisable immediately prior to the Effective

Time.   According to the Recommendation Statement, as of September 21, 2016, Raptor's directors and executive officers held Company Options to purchase an aggregate of 4,109,527 shares, of which Company Options with respect to an aggregate of 2,420,124 shares had exercise prices below the offer price of $9.00.   The table below sets forth, for each of Raptor's executive officers and directors, information regarding Company Options having an exercise price per share less than $9.00 per share held by each such executive officer or director as of September 21, 2016:

| Name | Number of Shares Subject to Company Options Held | Weighted Average Exercise Price per Company Option | | Total Consideration for Company Options | |
| --- | --- | --- | --- | --- | --- |
| **Executive Officers** | | | | | |
| Ashley C. Gould | 44,054 | $ | 3.74 | $ | 231,724 |
| David A. Happel | 93,784 | $ | 3.74 | $ | 493,304 |
| Krishna R. Polu, M.D. | 89,152 | $ | 3.74 | $ | 468,940 |
| Julie Anne Smith | 567,645 | $ | 5.50 | $ | 1,984,926 |
| Michael P. Smith | 84,751 | $ | 3.74 | $ | 445,790 |
| **Non-Employee Directors** | | | | | |
| Raymond W. Anderson | 290,000 | $ | 4.48 | $ | 1,312,200 |
| Suzanne L. Bruhn, Ph.D. | 120,680 | $ | 5.22 | $ | 455,987 |
| Richard L. Franklin, M.D., Ph.D. | 260,000 | $ | 4.65 | $ | 1,131,300 |
| Georges Gemayel, Ph.D. | 7,915 | $ | 5.22 | $ | 29,919 |
| Llew Keltner, M.D., Ph.D. | 244,164 | $ | 4.72 | $ | 1,044,835 |
| Gregg Lapointe | 7,915 | $ | 5.22 | $ | 29,919 |
| Christopher M. Starr, Ph.D. | 610,064 | $ | 5.22 | $ | 2,306,948 |

97.   In addition to accelerated vesting of Company Options, the Merger Agreement also contemplates that each Company RSU Award that is outstanding as of immediately prior to the Effective Time will become fully vested immediately prior to the Effective Time.   As of September 21, 2016, Raptor's directors and executive officers held Company RSU Awards covering an aggregate of 234,506 Shares. The table below sets forth information regarding Company RSU Awards held by each of Raptor's executive officers and directors as of September 21, 2016:

| Name | Number of Company RSU Awards Held | Total Consideration for Company RSU Awards | |
|---|---|---|---|
| **Executive Officers** | | | |
| Ashley C. Gould | 36,690 | $ | 330,210 |
| David A. Happel | 28,939 | $ | 260,451 |
| Krishna R. Polu, M.D. | 23,781 | $ | 214,029 |
| Julie Anne Smith | 64,179 | $ | 577,611 |
| Michael P. Smith | 22,607 | $ | 203,463 |
| **Non-Employee Directors** | | | |
| Raymond W. Anderson | 8,330 | $ | 74,970 |
| Suzanne L. Bruhn, Ph.D. | 8,330 | $ | 74,970 |
| Richard L. Franklin, M.D., Ph.D. | 8,330 | $ | 74,970 |
| Georges Gemayel, Ph.D. | 8,330 | $ | 74,970 |
| Llew Keltner, M.D., Ph.D. | 8,330 | $ | 74,970 |
| Gregg Lapointe | 8,330 | $ | 74,970 |
| Christopher M. Starr, Ph.D. | 8,330 | $ | 74,970 |

98.    In addition to the above unique monetary consideration payable to the directors and executive officer, pursuant to defendant Smith's amended and restated executive employment agreement, defendant Smith will receive approximately $4MM in change in control compensation if her employment is terminated within 18 months following the Effective Date.

99.    To ensure that the transaction receives the necessary approval, in connection with the Merger Agreement, Horizon and Merger Sub entered into tender and support agreements (the "Tender and Support Agreements,") with Julie Anne Smith, Raymond W. Anderson, Suzanne L. Bruhn, Ph.D., Richard L. Franklin M.D., Ph.D., Georges Gemayel, Llew Keltner, M.D., Ph.D., Gregg Lapointe, Christopher Starr, Ph.D., Michael Smith, David Happel, Krishna Polu and Ashley Gould (collectively, the "Committed Stockholders") pursuant to which the Committed Stockholders agreed to tender all shares owned by them into the Offer.

100.    Thus, while the Proposed Transaction is not in the best interests of Raptor stockholders, it will produce lucrative benefits for the Company's officers and directors.

***Preclusive Deal Protection Mechanisms***

101.    The Merger Agreement contains certain provisions that unduly benefit Horizon by

making an alternative transaction either prohibitively expensive or otherwise impossible.  For example, the Merger Agreement contains a termination fee provision that requires Raptor to pay up to $30 million to Horizon if the Merger Agreement is terminated under certain circumstances.  For example, under one circumstance, Raptor must pay this termination fee even if it consummates any Competing Acquisition Transaction (as defined in the Merger Agreement) *within 12 months following the termination* of the Merger Agreement.  This termination fee is an amount that will make the Company that much more expensive to acquire for potential purchasers.  The termination fee in combination with the preclusive deal protection devices will all but ensure that no competing offer will be forthcoming.

102.    The Merger Agreement also contains a "No Solicitation" provision that restricts Raptor from considering alternative acquisition proposals by, *inter alia*, constraining Raptor's ability to solicit or communicate with potential acquirers or consider their proposals.  Specifically, the provision prohibits the Company from directly or indirectly soliciting, initiating, proposing or inducing any alternative proposal, but permits the Board to consider "*an unsolicited bona fide Acquisition Proposal*" if it constitutes or is reasonably calculated to lead to a "*Superior Proposal*" as defined in the Merger Agreement.

103.    Moreover, the Agreement further reduces the possibility of a topping offer from an unsolicited purchaser.  Here, Defendants agreed to provide Horizon information in order to match any other offer, thus providing Horizon access to the unsolicited bidder's financial information and giving Horizon the ability to top the superior offer.  Thus, a rival bidder is not likely to emerge with the cards stacked so much in favor of Horizon.

***The Materially Misleading and/or Incomplete Recommendation Statement***

104.    On September 26, 2016, the Company filed with the SEC a materially misleading

33

and incomplete Recommendation Statement that failed to provide the Company's stockholders with material information and/or provides them with materially misleading information critical to the total mix of information available to the Company's stockholders concerning the financial and procedural fairness of the Proposed Transaction.

*Omissions and/or Material Misrepresentations Concerning the Sales Process leading up to the Proposed Transaction*

105.    Specifically, the Recommendation Statement fails to provide material information concerning the process conducted by the Company and the events leading up to the Proposed Transaction.  In particular, the Registration Statement fails to disclose the following information:

a.    The demands made by Sarissa in the March 25, 2016 letter to the Board, and what specific interactions the Raptor Board and management had with large stockholders as referenced in the Recommendation Statement, including the identity of the "large stockholders," and the timing and substance of the interactions;

b.    The reasons for retaining Leerink and committing millions of dollars to the retention, particularly in light of the conclusion of the April 6, 2016 Board meeting that Centerview was qualified for an expanded role assisting the Company in its strategic review process;

c.    The concerns about the tax inefficiencies expressed by the Board regarding Horizon's initial proposal;

d.    The criteria for determining the list of 42 potential strategic counterparties, whether Centerview or Leerink determined the criteria and the reasoning behind the decision not to solicit interest from financial investors;

e.      The criteria for determining the 14 prioritized strategic counterparties and the reason that the "six additional strategic counterparties" that were ultimately added to the outreach were not included on the original list;

f.      The nature of the adjustments to be made to the assumptions underlying key elements of the Non Risk-Adjusted All Programs Long-Term Forecast, which would be used by the Raptor Board in connection with its evaluation of any potential strategic transaction and by Centerview and Leerink in connection with their respective opinions and related financial analyses;

g.      The basis for allowing Centerview and Leerink to present a joint financial analysis rather than separate submissions;

h.      The information provided by management such that Centerview and Leeringk come derive unlevered free cash flows ("UFCF") for the Discounted Cash Flow Analysis and why management did not create the UFCF;

i.      The differences between the risk-adjusted long-term forecast and the internal financial forecasts prepared by Raptor management in evaluating Raptor's business;

j.      Which financial advisor chose the Selected Public Companies and the Selected Precedent Transactions to include in the analysis; and

k.      Why Centerview has a larger contingent fee payment than Leerink and given this, what additional role did Centerview play in order to earn the additional payment.

*Omissions and/or Material Misrepresentations Concerning Centerview's and Leerink's Financial Analyses*

106.    In the Recommendation Statement, Centerview and Leerink describes their

fairness opinion and the various valuation analyses performed to render the joint opinion. However, the Centerview and Leerink description fails to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions. Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinion.

107.   For example, the Recommendation Statement does not disclose material details concerning the analyses performed by Centerview and Leerink in connection with the Proposed Transaction, including (among other things):

*Selected Public Companies Analysis*

108.   With respect to Centerview and Leerink's *Selected Public Companies Analysis*, the Recommendation Statement fails to disclose:

    a.   Whether any type of benchmarking analysis for Raptor was performed in relation to the selected companies.

    b.   Whether any other multiples were calculated and compared in this analysis.

*Selected Precedent Transactions Analysis*

109.   With respect to Centerview's and Leerink's *Selected Precedent Transactions Analysis,* the Recommendation Statement fails to disclose:

    a.   The consideration for each of the listed transactions;

    b.   What if any difference resulted from Leerink and Centerview using different information sets and how such differences were resolved;

    c.    Whether any type of benchmarking for analysis for Raptor was performed in relation to the selected transactions;

    d.   The "other considerations" utilized by Centerview and Leerink in this analysis.

*Discounted Cash Flow Analysis*

110.    With respect to Centerview and Leerink's *Discounted Cash Flow Analysis*, the Recommendation Statement fails to disclose:

  a.    The information provided by Raptor management in order that the UFCF could be calculated;

  b.    The identify, quantify and source the WACC assumptions for Rentech and CVR respectively;

  c.    The individual inputs and assumptions utilized to derive the discount rate range of 11%-13%; and

  d.    The implied perpetuity growth rates and/or yields corresponding to the assumed terminal pricing multiples of Raptor.

111.    Without the omitted information identified above, Raptor's public stockholders are missing critical information necessary to evaluate whether the proposed consideration truly maximizes stockholder value and serves their interests.  Moreover, without the key financial information and related disclosures, Raptor's public stockholders cannot gauge the reliability of Morgan Stanley's fairness opinion and the Board's determination that the Proposed Transaction is in their best interests.

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

112.    In any situation where the directors of a publicly traded company undertake a transaction that will result in either a change in control or a break-up of the comapny's assets, the directors have an affirmative fiduciary obligation to act in the best interests of the company's stockholders, including the duty to obtain maximum value under the circumstances.  To diligently comply with these duties, the directors may not take any action that:

  a.    adversely affects the value provided to the company's stockholders;

  b.    will discourage or inhibit alternative offers to purchase control of the company or its assets;

   c.  contractually prohibits them from complying with their fiduciary duties; and/or;

   d.  will provide the directors, executives or other insiders with preferential treatment at the expense of, or separate from, the public stockholders, and place their own pecuniary interests above those of the interests of the company and its stockholders.

113. In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of Raptor, are obligated to refrain from:

   a.  participating in any transaction where the directors' or officers' loyalties are divided;

   b.  participating in any transaction where the directors or officers are entitled to receive a personal financial benefit not equally shared by the public stockholders of the company; and/or

   c.  unjustly enriching themselves at the expense or to the detriment of the public unitholders.

114. Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, violated, and are violating, the fiduciary duties they owe to Plaintiff and the other public stockholders of Raptor, including their duties of loyalty, good faith, candor, and due care.  As a result of the Individual Defendants' divided loyalties, Plaintiff and Class members will not receive adequate, fair or maximum value for their Raptor common stock in the Proposed Transaction.

115. As a result of these breaches of fiduciary duty, the Company's public stockholders will not receive adequate or fair value for their common stock in the Proposed Transaction.

## CLASS ACTION ALLEGATIONS

116. Plaintiff brings this action as a class action, pursuant to Federal Rule of Civil Procedure 23, individually and on behalf of all holders of Raptor common stock who are being and will be harmed by the Individual Defendants' actions, described herein (the "Class"). Excluded from the Class are Defendants and any person, firm, trust, corporation or other entity related to or affiliated with any Defendant.

117. This action is properly maintainable as a class action.

118. The Class is so numerous that joinder of all members is impracticable. As of September 21, 2016, there were 85,734,327 shares of Raptor stock issued and outstanding, resulting in hundreds, if not thousands of stockholders.

119. There are questions of law and fact which are common to the Class including, *inter alia*, the following:

    a. Whether the Proposed Transaction is unfair to the Class;

    b. Whether Plaintiff and the other members of the Class would be irreparably damaged were the transactions complained of herein consummated;

    c. Whether Defendants violated Federal laws;

    d. Whether the Individual Defendants are acting in furtherance of their own self-interest to the detriment of the Class;

    e. Whether the Class is entitled to injunctive relief or damages as a result of the wrongful conduct committed by the Defendants;

    f. whether the Individual Defendants have engaged in self-dealing, to the detriment of Raptor public stockholders;

g.      whether Raptor, Horizon and/or Merger Sub aided and abetted the Individual Defendants' breaches of fiduciary duty; and

h.      Whether Defendants have disclosed and will disclose all material facts in connection with the Proposed Transaction.

120.    Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class.   Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

121.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

122.    Defendants have acted, or refused to act, on grounds generally applicable to, and causing injury to the Class and, therefore, preliminary and final injunctive relief on behalf of the Class as a whole is appropriate.

## **FIRST COUNT**

### **Class Claims Against All Defendants For Violations of Section 14(e) of the Exchange Act**

123.    Plaintiff repeats all previous allegations as if set forth in full herein.

124.    The Individual Defendants have issued the Recommendation Statement with the intention of soliciting stockholder support of the Merger.

125.    Defendants violated Section 14(e) of the Exchange Act by issuing a Registration Statement that was materially misleading in numerous respects and omits material facts, including those set forth above.  Moreover, in the exercise of reasonable care, the Individual Defendants should have known that the Recommendation Statement is materially misleading and omits material facts that are necessary to render them non-misleading.

126.    Defendants knew that Plaintiff would rely upon their statements in the Registration Statement in determining whether to tender his shares pursuant to the tender offer commenced in conjunction with the Proposed Transaction.

127.    The misrepresentations and omissions in the Registration Statement are material to Plaintiff, and Plaintiff will be deprived of his entitlement to make a fully informed decision whether to tender his shares if such misrepresentations and omissions are not corrected prior to the expiration of the tender.

128.    Because of the false and misleading statements in the Registration Statement, Plaintiff is threatened with irreparable harm, rendering money damages inadequate.  Therefore, injunctive relief is appropriate to ensure Defendants' misconduct is corrected.

## SECOND COUNT

### Class Claims for Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

129.    Plaintiff brings this Exchange Act claim on behalf of himself as individuals and on behalf of all other Raptor stockholders.

130.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

131.    The Individual Defendants acted as controlling persons of Raptor within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as

officers and/or directors of Raptor, and participation in and/or awareness of the Company operations and/or intimate knowledge of the false statements contained in the Recommendation Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

132.    Each of the Individual Defendants were provided with or had unlimited access to copies of the Recommendation Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

133.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Recommendation Statement, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.  The Registration Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Merger.  They were, thus, directly involved in the making of this document.

134.    In addition, as the Recommendation Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Merger.  The Recommendation Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered.   The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

135.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

136.    In addition, as the Recommendation Statement sets forth at length, and as

described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.  The Recommendation Statement purports to describe the various issues and information that they reviewed and considered — descriptions which had input from the Individual Defendants.

## THIRD COUNT

### Class Claims Against the Individual Defendants for Breach of Fiduciary Duties

137.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

138.    The Individual Defendants have violated the fiduciary duties of loyalty, care and good faith owed to public stockholders of Raptor and have acted to put their personal interests ahead of the interests of Raptor's stockholders.

139.    By the acts, transactions, and course of conduct alleged herein, the Individual Defendants, individually and acting as part of a common plan, are attempting to unfairly deprive Plaintiff and the other members of the Class of the true value of Raptor.

140.    The Individual Defendants have violated their fiduciary duties by entering Raptor into the Proposed Transaction without regard to the effect of the Proposed Transaction on Raptor's stockholder.

141.    As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required and breached their duty of loyalty owed to the stockholders of the Company because, among other reasons:

      a.    they failed to take steps to maximize the value of Raptor to its public stockholders;

      b.    they failed to properly value Raptor and its various assets and operations;

and

> c.    they ignored or did not protect against the numerous conflicts of interests resulting from the Individual Defendants' own financial stakes in the Proposed Transaction.

142.    Because the Individual Defendants control the business and corporate affairs of Raptor, and have access to private corporate information concerning Raptor's assets, business, and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public stockholders of Raptor that makes it inherently unfair for them to pursue and recommend the Proposed Transaction wherein they will reap disproportionate benefits to the exclusion of maximizing stockholder value.

143.    By reasons of the foregoing acts, practices, and course of conduct, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary duties toward Plaintiff and the other members of the Class.

144.    The Individual Defendants are engaging in self-dealing, are not acting in good faith toward Plaintiff and the other members of the Class, and have breached and are breaching their fiduciary duties to the Class.

145.    As a result of the Individual Defendants' unlawful actions, Plaintiff and the other members of the Class will be irreparably harmed in that they will not receive their fair portion of the value of Raptor's assets and operations.  Unless the Merger is enjoined by the Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiff and the Class, and may consummate the Merger, all to the irreparable harm of the members of the class.

146.    Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the

immediate and irreparable injury that Defendants' actions threaten to inflict.

## FOURTH COUNT

### Aiding and Abetting the Individual Defendants' Breaches of Fiduciary Duties
### Against Raptor, Horizon, and the Merger Sub

147.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

148.    As set forth above, the Individual Defendants owed Raptor's public stockholders duties and obligations that the Individual Defendants breached in respect to the Merger.

149.    Further, each of the other defendants knowingly participated in the foregoing breaches by directly or indirectly causing the Individual Defendants to pursue the Merger and enter into the Merger Agreement, thereby causing damage to Plaintiff and the Class.

150.    Plaintiff and the Class have no adequate remedy at law.    Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands injunctive relief, in his favor and in favor of the Class, and against the Defendants, as follows:

A.    Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B.    In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C.    Directing the Individual Defendants to disseminate a Recommendation Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.      Declaring that Defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

F.      Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands trial by jury of all claims so triable.

Dated: October 5, 2016                              **RIGRODSKY & LONG, P.A.**

                                                    By:  _/s/ Brian D. Long_____
                                                         Seth D. Rigrodsky (#3147)
                                                         Brian D. Long (#4347)
                                                         Gina M. Serra (#5387)
                                                         Jeremy J. Riley (#5791)
                                                         2 Righter Parkway, Suite 120
                                                         Wilmington, DE 19803
                                                         Phone: (302) 295-5310
                                                         Fax: (302) 654-7530

                                                         *Counsel for Plaintiff*

**OF COUNSEL:**

**BRODSKY & SMITH, LLC**
Evan J. Smith
Marc L. Ackerman
Two Bala Plaza, Suite 510
Bala Cynwyd, PA 19004
Phone: (610) 667-6200
Fax: (610) 667-9029